BOAM v. GREENMAN.

SPECIFIC PERFORMANCE—CONTRACT TO CONVEY—ORAL CONTRACT
—EVIDENCE TO ESTABLISH—SUFFICIENCY.

On a bill against administrators to enforce specific perform-
ance of an alleged parol contract of their intestate to give
complainants a farm in consideration of support and care,
evidence examined, and *held,* insufficient to sustain the bur-
den of establishing the contract.

Appeal from Ingham; Wiest, J. Submitted October
11, 1906. (Docket No. 52.) Decided February 5, 1907.

Bill by Andrew Boam and Louisa Boam against James
Greenman, Minnie Costigan, and Melzar Turner, admin-
istrator of the estate of Jacob D. Greenman, deceased, for
the specific performance of a land contract. From a de-
cree dismissing the bill, complainants appeal. Affirmed.

*Q. A. Smith* and *O. J. Hood,* for complainants.

*Charles F. Hammond* (*Rollin H. Person,* of counsel),
for defendants.

BLAIR, J. This is a suit instituted to compel the spe-
cific performance of an oral agreement alleged to have been
made by complainants with Jacob D. Greenman, since
deceased. The defendants are, respectively, a son, a
daughter, and the administrator of the estate of said
Jacob D. Greenman, deceased. The oral agreement, as
stated in the bill of complaint, was as follows: That the
said Jacob D. Greenman:

"Promised to complainants that, if they would return
to his said farm and live there while he lived, allowing
him to have one-half of the proceeds of the farm, by doing
such work as his health might permit of, to enable him to
pay the taxes, keep up repairs on the place, purchase his
necessary clothing, and medicines and medical attend-

ance, complainants furnishing him with board, lodging, washing, and mending, care, and attention in sickness, that he would give to said complainants the said farm and everything on the place, and stated and promised to complainants that he would make out writings that would show complainants' right and title thereto."

In 1892, Jacob D. Greenman lived on the land in question in this suit about three-quarters of a mile west of Pine Lake, in Ingham county. His family at that time consisted of himself, his wife, and two children, James Greenman and Minnie Costigan. He had parted with his wife and instituted proceedings for a divorce. He had become estranged from his daughter and they never spoke together afterwards. He had other land but had conveyed it to his son, James, subject to a life use by his wife, in the property settlement. His wife had taken up her residence with her son, James, on the land deeded to him subject to her life use. So far as the record discloses, Mr. Greenman was on friendly terms with his son and with his granddaughter, Dulcie Costigan. In the spring of 1892, Mr. Greenman agreed with complainant Andrew Boam, a brother Odd Fellow, that he should move upon the place and work it on shares on the terms of furnishing half and having half and allowing Mr. Greenman to retain a certain bedroom off from the parlor for his own use and occupancy. Complainant Boam and his family occupied the premises until the spring of 1900, when they moved to Presque Isle county, where Mr. Boam had purchased 40 acres of land, and upon which he erected a small house. The relations between Jacob Greenman and the Boam family seem to have been very cordial and he visited them while they were on the homestead in Presque Isle county. It is the contention of complainants that it was on one of these visits that the contract in question was made, in pursuance of which the Boams returned to and occupied the Greenman farm near Pine Lake.

There was testimony on behalf of complainants tending to show that complainants were reluctant to return, and

insisted before agreeing to return that Mr. Greenman should put the proposed agreement into writing, which he promised to do upon his return to Ingham county, saying that he was better acquainted there.    There was also testimony tending to show that several letters were written, requesting the return of the Boam family and referring to the agreement, but none of such letters were produced and some evidence was given tending to show that they might have been lost on the return from Presque Isle to Ingham county.    Complainants do not appear to have called Mr. Greenman's attention to his promise to execute written evidence of their agreement after their return to Ingham county.    Complainants' main contention as to the terms of the agreement was based upon statements alleged to have been made by Jacob D. Greenman to complainants and different members of their family and to persons outside the family as to his intention in that regard and his statements as to what he had actually done.    The defendants rely upon, in their defense, and give testimony tending to show, statements, admissions, and acts of the complainants inconsistent with the agreement as claimed by them. Testimony of oral admissions has always been regarded as the least satisfactory evidence for the establishment of disputed facts.    Obviously, the value of such testimony depends largely upon the intelligence of the transmitter, the accuracy of his memory, his freedom from bias, and his opportunity to receive and understand and faithfully interpret the language and meaning of the person whose admission is the subject of his testimony.    Such testimony is much less satisfactory when the only person who could correct it is dead, as in this case, and the dangers of testifying falsely or incorrectly are absent.    In the case of the testimony of admissions by complainants, the complainants were present in court with the members of their family and able to and did answer such testimony, and though still of an unsatisfactory class, it has some sanctions which are absent from those attending the testimony of the admissions of a dead man.    Numerous witnesses

were sworn on both sides of the case, and presumably all the testimony that could be procured on either side was brought before the court.   The circuit judge, after hearing all the testimony, filed an opinion in which he held that complainants had not sustained the burden of proof which rested upon them to establish the making of the contract by a preponderance of the evidence.

This is a case where, in view of the sharp conflict of the testimony, complainants and the members of the family contradicting absolutely the testimony of apparently disinterested witnesses, some weight should be given to the well-settled rule that in cases where the question is close as to where the preponderance of the evidence lies, this court will attach importance to the finding of the circuit judge.   It is also a case where the burden of proof should be deemed of considerable importance.   A great many witnesses were sworn in the case, and, in order to properly discuss the questions of fact involved, it would be necessary to occupy a great deal of space, with no corresponding advantage to the parties or the profession.   It is apparent from the opinion of the circuit judge, that he credited the testimony of the son, James Greenman, his uncle, Scott Greenman, who were interested in the result, as supported by several other witnesses who were disinterested, as to the acts, statements, and representations of complainants immediately after the death and during several weeks following the death of Jacob D. Greenman, to the effect that they were holding the premises as tenants, only, of said Jacob D. Greenman.   The complainants, according to their own testimony, had no uncertainty as to their rights under the alleged contract, at least, so far as related to the real estate, and intended to, and claimed that they were occupying the premises from the time of Greenman's death under that agreement. Such claim is wholly inconsistent and irreconcilable with the conduct of complainants and their statements as testified to by witnesses who were credited by the trial judge, and whose testimony appears to us to have been quite as

reasonable as the testimony of complainants. Among other instances, we cite the following: Soon after the funeral, according to the testimony of James Greenman and his uncle, Scott Greenman, they called at the place and talked with complainants about leasing the farm to them:

" Mrs. Boam said she wished I would come over in a few days because it was getting late in the season and they wanted to know whether they were going to stay there or not. She said, ' We will rent the place the same as we rented it of your father, or we will pay money rent,' and I says, ' If we can agree on the terms, you can work the place.' "

Scott Greenman testified as to this conversation, as follows:

" We were there the next time in perhaps a day or two afterward, and Mrs. Boam spoke to James about renting the place. Mr. Boam was in the house and Mrs. Boam and some of the girls. Mr. Boam was sitting up dressed. Mrs. Boam did all the talking and says to Jimmie: ' It is getting pretty late, and it is not much of a chance to get another place. We would like to know whether we are going to stay here or not. We will rent the place of you just the same as we worked it for your father, or we will pay money rent.' "

On another day, James Greenman testified:

" I asked them first how they wanted to rent the place. Hank thought he would rather work the place on shares, the same as he had been working it, but I told them if they rented the place on shares, they could not keep so many chickens on the place, and if they rented the place for money rent, they could keep all the chickens they wanted to. Mr. Boam thought he could not afford to pay money rent, so we did not decide the matter that day. If they paid cash, I told them I would rent for $150. Mrs Boam asked if they could put the wheat in in the fall. I told her I did not know what we would do with the place; maybe we would sell it. She says, ' For heaven's sake, if you sell that place, give us a chance to buy it. Art will work his fingernails off to pay for it if he could buy it.' "

Arthur Boam, a son of complainants, testified, as to this conversation, as follows:

"He came there and said he came to rent the place.  I heard him.  I don't know as he addressed anybody in particular.  I took it that he was talking with my father and mother.  They did not tell him that they wanted to rent the place.  I remember that Mr. Greenman said that we could have it for·$150 cash rent.  My father told him, he says: 'Wait a few days, Jim, I am sick, and when I get better, I will see what I can do.'  I don't remember anything else being said.  I couldn't say how long after Mr. Greenman died it was.  That is the only time I heard any talk."

Complainant Andrew Boam testified as follows:

"I had no talk about it.  I had no talk with him about renting the place of him.

"*Q.* Do you remember any time when he made any proposition to you about the rent?

"*A.* Yes, he was over there one night and wanted to— he asked me if I wanted to stay; I would have to pay him $150 for another year.  I told him I would think about it.  I says: 'I am sick.  I am not able to talk about doing any business.  I don't know as I want to farm it.'  That was all I said to him.  I was sick.  I was not able to do no business.  We didn't have any talk about renting it on shares.  All the talk between him and I was in regard to that proposition of $150 rent.  At the time he was talking about that Art and my wife were there, and I guess the girls were in the room.  I think they were.  I don't remember what my wife was doing. I guess she was doing the housework there."

Isaac Piper testified that on Saturday following Jacob D. Greenman's funeral he met Mrs. Boam:

"I asked her if they were going to move this spring. She said they hadn't seen Jimmie since the funeral, that he was visiting with his uncle and they could not tell until they saw him."

Gilbert Cushman testified to a conversation with Mr. Boam some months before Jacob D. Greenman's death, in which Mr. Boam said he intended to leave the place

as soon as he could get another place.  William Seeley
testified:

"I had some talk with Mr. Boam about taking the
farm.  It was two years ago last spring, I think in April.
(This would be the spring of 1903.)  It was at my barn.
Mr. Boam, my wife, and myself were present.  I asked
him if he wanted to take my farm.  He said he would take
it if his son would come home and take it with him.  He
said he didn't know whether he would stay where he was or
not.  He said him and Jimmie Greenman did not get along
very well together.  I told him I wanted to furnish half
and have half."

It is said that the date shows that this testimony related
to an occurrence a year before Jacob D. Greenman's death,
but we think the context clearly shows that it was in-
tended to apply to the April following his death.  Other
witnesses testified along the same line and the conduct
of complainants in permitting James Greenman to re-
move property which, under the agreement alleged,
belonged to complainants, without protest, supported, to
some extent, at least, his alleged admissions.  Giving to
the opinion of the circuit judge that weight as to the
credibility of witnesses which we think it is entitled to in
a case like this, we agree with his conclusion that the con-
tract alleged to have been made was not sustained by a
preponderance of the evidence.

The decree is affirmed, with costs of both courts to de-
fendants.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ.,
concurred.